UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RIDWANE MOURMOUNI and
ISSIFI KALIKOYE,
                            Plaintiffs,

              -v-

PERMANENT MISSION OF THE
REPUBLIC OF SOUTH SUDAN TO THE
UNITED NATIONS and
CECILIA ADENG,
                            Defendants.

20-CV-3603 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

      Plaintiffs Ridwane Mourmouni and Issifi Kalikoye bring this wage-and-hour suit against Defendants Permanent Mission of the Republic of South Sudan to the United Nations and Deputy Permanent Representative Cecilia Adeng. (Dkt. No. 1; Dkt. No. 29.) Plaintiffs allege that, between 2015 and 2019, they worked as chauffeurs for Defendants, who failed to pay them minimum wage and overtime, failed to provide them with pay stubs, and failed to record their hours worked. Plaintiffs bring claims under the Fair Labor Standard Act ("FLSA"), New York Labor Law ("NYLL"), and claims for breach of contract, unjust enrichment, and tort.

      Defendants now invoke Defendant Adeng's diplomatic immunity under the Diplomatic Relations Act and the Permanent Mission's state immunity under the Foreign Sovereign Immunity Act ("FSIA"). They move to dismiss Plaintiffs' claims for lack of jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). In the alternative, they move to dismiss certain of Plaintiffs' state law claims on the merits, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Defendants' Rule 12(b)(1) motion to dismiss for lack of

1

jurisdiction is granted in part and denied in part, and the Rule 12(b)(6) motion to dismiss certain claims for failure to state a claim is granted.

I.      Discussion

     A.      **Diplomatic Immunity for Defendant Adeng**

The Diplomatic Relations Act provides that "[a]ny action or proceeding brought against an individual who is entitled to immunity . . . under the Vienna Convention on Diplomatic Relations ["VCDR"], . . . or under any other laws extending diplomatic privileges and immunities, shall be dismissed." 22 U.S.C. § 254d. Defendant Adeng argues that she, as the current Deputy Permanent Representative to the United Nations for South Sudan, is entitled to diplomatic immunity under the VCDR. She notes that in *Brzak v. United Nations*, the Second Circuit held that "current diplomatic envoys enjoy absolute immunity from civil and criminal process." 597 F.3d 107, 113 (2d Cir. 2010).

Defendant Adeng is correct that she is entitled to diplomatic immunity based on her current role, though she is incorrect that the VCDR applies directly to her case. The VCDR addresses missions, such as embassies, established for the purpose of managing relations between a "sending State" and a "receiving State." Vienna Convention on Diplomatic Relations art. 3., Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95. Permanent missions to the United Nations are established to manage a sending state's affairs at the United Nations and do not operate within the VCDR's sending state-receiving state paradigm. Accordingly, permanent missions and their diplomats "enjoy an independent status" that historically has been governed by agreements with the host state of the receiving United Nations headquarters. A CONCISE ENCYCLOPEDIA OF THE UNITED NATIONS 546 (Helmut Volger, 2d ed. 2010).

In the United States, the relevant immunities regime is the Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United

Nations ("Headquarters Agreement"), June 26, 1947, 61 Stat. 758, T.I.A.S. 1676, 11 U.N.T.S. 11.  Article V of the Headquarters Agreement provides that permanent mission diplomats "shall . . . be entitled in the territory of the United States to the same privileges and immunities . . . as [the United States] accords to diplomatic envoys accredited to it," *i.e.*, diplomats covered by the VCDR.  *See Ahmed v. Hoque*, No. 01-cv-7224, 2002 WL 1964806, at *2 (S.D.N.Y. Aug 23, 2002).  Under the Diplomatic Relations Act, Defendant Adeng enjoys diplomatic immunities based not on the VCDR *per se* but instead on "other laws extending diplomatic privileges and immunities."  By way of those other laws, the Headquarters Agreement, she is entitled to the same absolute immunity afforded diplomats under the VCDR.[1]  *Tachiona v. United States*, 386 F.3d 205, 217 (2d Cir. 2004) ("[R]esident representatives are already granted full diplomatic privileges and immunities under the headquarters agreement." (quoting S. Exec. Rep. No. 91–17, at 11 (1970))).

Because Defendant Adeng is entitled to absolute immunity, the Court lacks jurisdiction over the claims against her.  *See Ahmed*, 2002 WL 1964806, at *5.  The claims are dismissed accordingly.

**B.**     **State Immunity for the Permanent Mission**

Having dismissed the claims against Defendant Adeng, the Court now turns to the claims against the Permanent Mission.  Like Defendant Adeng, the Permanent Mission asserts its

---

[1] In their amended complaint, Plaintiffs cite *Swarna v. Al-Awadi* for the proposition that diplomats do not enjoy immunity for "actions that pertain to [their] household or personal life." 622 F.3d 123, 134 (2d Cir. 2010).  Plaintiffs miss the critical context of *Swarna*:  The defendant there had ended his tenure with the Permanent Mission of the State of Kuwait to the United Nations and, as a former diplomat, was entitled only to "residual immunity" at the time of the litigation.  *Id*.  There is no contention here that Defendant Adeng is a former diplomat.

immunity from suit. The FSIA applies as the statutory regime pertinent to foreign states' agencies and instrumentalities, rather than foreign states' diplomats.

Under the FSIA, foreign states are generally immune from the jurisdiction of U.S. courts and thus cannot be sued stateside. 28 U.S.C. § 1604. But the FSIA codifies the so-called "restrictive theory" of state immunity under international law, whereby states "enjoy immunity as to their public acts" only. *Mobil Cerro Negro, Ltd. v. Bolivarian Repub. of Venezuela*, 863 F.3d 96, 103–04 (2d Cir. 2017); *see also* H.R. Rep. No. 94-1487, at 14 (1976) (explaining that the "central premise" of the FSIA is that "decisions on claims by foreign states to sovereign immunity are best made . . . on the basis of a statutory regime which incorporates standards recognized under international law"). A key caveat of the restrictive theory is that foreign states do not enjoy immunity "as to their private or commercial activities outside of their territories." *Mobil Cerro Negro*, 863 F.3d at 103–04. Consistent with this caveat, the FSIA provides that there is no immunity for a foreign state's actions that are "based upon a commercial activity carried on in the United States." 28 U.S.C. § 1605(a)(2). The parties dispute whether the commercial exception applies here, to the Permanent Mission's employment of Plaintiffs as chauffeurs.

It is well established that a foreign state's employment relationships can be commercial in nature, thereby implicating the commercial exception and triggering U.S. courts' jurisdiction. *See Kato v. Ishihara*, 360 F.3d 106, 111 (2d Cir. 2004). The question courts must ask when evaluating whether a particular employee is engaged in public acts or instead in commercial activity is "whether [his] activities . . . were typical of a private party engaged in commerce." *Id*. If there is "nothing quintessentially governmental" about the employee's work, *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 564 (2d Cir. 2020), as may be the case for work performed by

4

"laborers, clerical staff or public relations or marketing agents," *Kato*, 360 F.3d at 110 (quoting H.R. Rep. No. 94-1487, at 16), the commercial exception applies and U.S. courts may adjudicate the employee's claims.

The Permanent Mission argues that chauffeurs supporting a consulate or permanent mission engage in quintessentially governmental work, pointing to a recent string of cases that have barred chauffeurs' employment claims based on state immunity: *Figueroa v. Ministry of Foreign Affairs of Sweden*, 222 F. Supp. 3d 304 (S.D.N.Y. 2016), *Ayekaba v. Mba*, No. 18-cv-12040, 2020 WL 1130731 (S.D.N.Y. Mar. 6, 2020), and *Bardales v. Consulate Gen. of Peru of New York*, 490 F. Supp. 3d 696 (S.D.N.Y. 2020). In doing so, the Permanent Mission groups chauffeurs with diplomats and policy advisers, rather than with clerical workers. *Cf. Hijazi v. Permanent Mission of Saudi Arabia to the United Nations*, 689 F. Supp. 2d 669, 675 (S.D.N.Y. 2010) (determining that the plaintiff's job was not "purely clerical" and "commercial" because she "worked[] just below the diplomatic level" and "sp[oke] on one occasion on behalf of Saudi Arabia at a United Nations conference"). As a general matter, the Court disagrees with this characterization.

In most circumstances, the work performed by a chauffeur for a permanent mission "is an activity that could be, and in fact regularly is, performed by private-sector businesses," such as car services and corporations employing in-house executive chauffeurs. *Pablo Star*, 961 F.3d at 562. There are, of course, exceptions. *Id*. at 561–62 (explaining that analysis of whether activity falls within the commercial exception requires "nuanced examination of the context of the acts involved"). The Court allows that *Figueroa* — the first of the cited cases to extend state immunity to an employment dispute involving a chauffeur — may have been correctly decided. In that case, the plaintiff was responsible for "chauffeuring the Swedish Ambassador and the

Ambassador's family, Swedish diplomats and their families, and members of the Royal Family of Sweden." 222 F. Supp. 3d at 308.  It is within reason to believe that driving literal royalty through New York City is materially distinguishable from the work of the average Uber or Lyft driver.  But *Figueroa* cannot justify the outcomes in *Ayekaba* and *Bardales*, both of which rely on the case but lack its exceptional facts.  Nor can *Figueroa* justify a grant of immunity here, where Plaintiffs' work was limited to the mundane tasks of driving the Permanent Mission's staff and their families, delivering packages, and maintaining the Permanent Mission's vehicles.  (Dkt. No. 49 ¶¶ 14–16.)  There is no basis for granting a foreign state immunity for its exploitation of chauffeurs whose work is important but no different from work performed in the private sector. *See Hijazi*, 689 F. Supp. 2d at 675 ("[I]t would be clear that hiring purely clerical staff, even clerical staff that types diplomatic speeches, comes within the commercial activity exception.").

The conclusion that the employment of a chauffeur is generally a commercial activity is confirmed by international law.  Courts around the world have permitted embassy and consulate chauffeurs to bring cases under the restrictive theory of state immunity that the FSIA codifies. *See* Philippa Webb, *The Immunity of States, Diplomats and International Organizations in Employment Disputes: The New Human Rights Dilemma?*, 27 Eur. J. Int'l L. 745, 751 (2016) ("A key variable is whether the employee has been involved in sovereign activities.  Low-level employees such as a cleaner, a driver, and a clerk have been allowed to sue foreign states for employment claims." (footnotes omitted)); *accord* Richard Garnett, *State and Diplomatic Immunity and Employment Rights: European Law to the Rescue?*, 64 Int'l & Comparative L.Q. 783 (2015) (collecting state practice).  Most notably, in *Mahamdia v. People's Democratic Republic of Algeria*, the Court of Justice of the European Union held that, "since the [plaintiff] was a driver at the embassy, his activities did not form part of the exercise of public powers by

6

the defendant State," and "German courts had jurisdiction to hear the case." No. C-154/11, [2013] ECR, 1, at ¶ 27.  Courts outside the European Union, ranging from those in India to Australia, have rendered similar decisions.  *See Shyam Lal v. Union of India*, No. 10185/2009, [2010] INDLHC 4446, at ¶ 11 (India) (denying state immunity with respect to employment claims brought by a chauffeur for the Embassy of Greece); *Hussein v. People's Bureau of the Great Socialist People's Libyan Arab Jamahiriya*, No. U2006/2302, [2006] AIR 486 (Austl.) (denying state immunity with respect to employment claims brought by a chauffeur and receptionist for the Embassy of Libya).  The Court is mindful of this practice given Congress's express intent that the FSIA incorporate international law standards, as well as the evergreen rule that courts must "construe[] ambiguous statutes to avoid unreasonable interference with . . . international law."  *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004); *Murray v. Schooner Charming Betsy*, 2 Cranch 64, 118 (1804).

Finally, and in light of the Supreme Court's recent decision in *Federal Republic of Germany v. Philipp*, it bears mention that permitting Plaintiffs to pursue their claims would not "produc[e] friction in our relations with other nations and lead[] some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation." 141 S. Ct. 703, 714 (2021) (citations omitted).  Absent any concerted tit-for-tat, foreign courts would already allow chauffeurs employed by a U.S. embassy or consulate to bring claims relating to unlawful labor conditions.  The Court determines that the commercial exception applies and that the Permanent Mission's jurisdictional challenge fails.

    **C.**    **Plaintiffs' State Law Claims**

In addition to challenging this Court's jurisdiction over Plaintiffs' claims, the Permanent Mission challenges certain of Plaintiffs' claims on the merits.  The Permanent Mission argues (1) that Article 6 of the NYLL — the Article under which Plaintiffs bring all but their minimum

7

wage and overtime NYLL claims — does not apply to it and (2) that Plaintiffs' unjust enrichment and tort claims are duplicative of their breach of contract claim. The Permanent Mission is right on both scores. Article 6 expressly exempts "governmental agenc[ies]" from its set of covered employers. NYLL § 190(3). And each of Plaintiffs' unjust enrichment and tort claims revolves around the Permanent Mission's alleged failure to pay Plaintiffs' contractually agreed-upon wages. Under New York law, unjust enrichment and tort claims cannot proceed if they simply restate a breach of contract claim and the validity of the contract is not in question. *See Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012); *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir. 1980).

The Court dismisses Plaintiffs' NYLL claims based on Article 6, as well as their unjust enrichment and tort claims. Plaintiffs' FLSA claims, NYLL minimum wage and overtime claims, and breach of contract claim against the Permanent Mission may proceed to discovery.

## II.     Conclusion

For the foregoing reasons, Defendants' Rule 12(b)(1) motion to dismiss for lack of jurisdiction is GRANTED in part and DENIED in part, and their Rule 12(b)(6) motion to dismiss certain claims for failure to state a claim is GRANTED.

The Permanent Mission is directed to answer the remaining claims by October 20, 2021. The Clerk of Court is directed to close the motions at Docket Numbers 42 and 46, and to mail a copy of this Opinion to Plaintiffs, now proceeding *pro se*.

SO ORDERED.

Dated: September 28, 2021
       New York, New York

_____
J. PAUL OETKEN
United States District Judge